Ernest L. ANDERSON, Appellant,

v.

Robert E. HAAS, Joseph Wert and the State of New Jersey.

Ernest L. ANDERSON

v.

Robert E. HAAS, Joseph Wert and the State of New Jersey.

Robert E. Haas and Joseph Wert, Appellants.

Nos. 14592, 14593.

United States Court of Appeals Third Circuit.

Argued Sept. 14, 1964.

Decided Feb. 12, 1965.

**498**

John W. Hayden, Jr., Deputy Atty. Gen., Newark, N. J. (Arthur J. Sills, Atty. Gen. of New Jersey, Trenton, N. J., on the brief), for Robert E. Haas, Joseph Wert and State of New Jersey.

Julius Braun, Lakewood, N. J., for Ernest L. Anderson.

Before BIGGS, Chief Judge, and McLAUGHLIN and STALEY, Circuit Judges.

STALEY, Circuit Judge.

This is an appeal by defendants, New Jersey State Police officers, from a judgment entered against them upon a directed verdict in an action for damages under § 1 of the Civil Rights Act of 1871, 42 U.S.C. § 1983.[1] A cross appeal challenging the measure of damages used by the district court was filed by the plaintiff.

Plaintiff Ernest L. Anderson, a resident of South Toms River, New Jersey, brought suit against Robert E. Haas and Joseph Wert, alleging that, while acting under color of state law, they illegally arrested him and detained him and, therefore, that he was "deprived * * * of rights, privileges, or immunities secured by the Constitution and laws of the United States," and that the officers "maliciously and without probable cause" commenced an action against him.

The trial was to a jury. At the conclusion of defendants' case, the court directed a verdict for the plaintiff on the issue of liability. The question of damages, however, was left to the jury which awarded $100. For the reasons which follow we must reverse and remand for a new trial.

Defendants contend that the district court erred in directing a verdict for the plaintiff and in failing to grant a new trial. They argue that, under proper instructions, the jury could have determined that the arrest without a warrant was legal or that, if the arrest was technically illegal, the officers acted "in good faith and without malice" and are therefore not liable under the Civil Rights Act. Unfortunately, we do not have the advantage of an opinion from the district court setting forth the reasons for its directed verdict for the plaintiff. We do not, therefore, have any clear guide to the authority used by the court to support its conclusion. Remarks made by the court and recorded in the trial transcript indicate, however, that the court thought the officers were liable under § 1983 because their acts were not sanctioned by the applicable New Jersey statutes covering arrest. In their briefs

---

1. The statute provides:

    "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

and argument on the question of the legality of the arrest, the parties have treated the matter as one of state law, to be resolved by the application of the pertinent state arrest statutes to the facts.

The Supreme Court, in Ker v. State of California, 374 U.S. 23, 34, 83 S.Ct. 1623, 1630, 10 L.Ed.2d 726 (1963) stated:

"* * * While this Court does not sit as in *nisi prius* to appraise contradictory factual questions, it will, where necessary to the determination of constitutional rights, make an independent examination of the facts, the findings, and the record so that it can determine for itself whether in the decision as to reasonableness the fundamental— *i. e.*, constitutional—criteria established by this Court have been respected. The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, *provided that those rules do not violate the constitutional proscription of unreasonable searches and seizures* and the concomitant command that evidence so seized is inadmissible against one who has standing to complain. See Jones v. United States, 362 U.S. 257 [80 S.Ct. 725, 4 L.Ed.2d 697] (1960). Such a standard implies no derogation of uniformity in applying federal constitutional guarantees but is only a recognition that conditions and circumstances vary just as do investigative and enforcement techniques." (Emphasis ours.)

"It is immaterial whether respondents' conduct is legal or illegal as a matter of state law." McNeese v. Board of Education, 373 U.S. 668, 674, 83 S.Ct. 1433, 1437, 10 L.Ed.2d 622 (1963); Monroe v. Pape, 365 U.S. 167, 171–187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). Here, the plaintiff's claim is based upon an alleged violation of his rights under the Constitution of the United States, and we must look to Federal law to determine whether such violation occurred.

Recently, the Supreme Court in Beck v. State of Ohio, 85 S.Ct. 223 (1964), set forth the criteria for determining the constitutional validity of an arrest with which we are here concerned. There it stated:

"* * * Whether that arrest was constitutionally valid depends in turn upon whether, at the moment the arrest was made, the officers had probable cause to make it— whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the *petitioner had committed or was committing an offense.* Brinegar v. United States, 338 U.S. 160, 175–176 [69 S.Ct. 1302, 93 L.Ed. 1879]; Henry v. United States, 361 U.S. 98, 102 [80 S.Ct. 168, 4 L.Ed.2d 134]. 'The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating * * * often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice.' Brinegar v. United States, supra, 338 U.S. at 176 [69 S.Ct. at 1311]." (Emphasis ours.)

With this in mind, we review the facts developed at the trial, together with the inferences from them, in the light most favorable to the defendants since the district court directed a verdict against them.

At approximately 10:30 P.M. on the evening of February 16, 1962, State Police Troopers Robert E. Haas and Joseph Wert, defendants, while on patrol, received a call reporting shooting in the Brook Forest area of South Toms River, New Jersey. Proceeding to the scene, they discovered that four or five residents of the area had come out of their

houses. The people on the street reported hearing shooting near the home of Ernest L. Anderson at 400 Brook Forest Drive. The officers proceeded to the Anderson house and knocked on the rear door near the garage. Anderson appeared and admitted firing the gun. He explained that he had received it from his wife for his birthday and was trying it out by firing it in the back yard. At the request of the officers he promised not to fire it again. On this visit, the officers saw two or three spent shotgun shells at the back of the house near the garage. Anderson and his wife had been drinking.

During this visit, one of Anderson's neighbors, who lived in a house 250 to 300 feet away from him, reported he had heard what sounded like a gunshot about 10:00 P.M., and, immediately after, heard something hit the side of his house. He had then gone outside to quiet his dog but had been forced to fall to the ground when he saw Anderson, who was standing at the garage door, fire another shot and he didn't know where he was aiming.

Anderson's house was located in a suburban development of about 800 houses. The row of houses on which it was located was curved in such fashion that the rear of Anderson's house was on a line to the rear of several other houses on the block. The houses were only thirty-five to forty feet apart.

After the first incident, the defendants continued their patrol until they retired at 3:00 A.M., to the State Police Barracks at Toms River. At 4:00 A.M. they were awakened and advised that another call had come from Brook Forest in reference to a person shooting a gun. They dressed and went to the scene.

On arrival both troopers observed that there were now about six spent shotgun shells lying near the garage. Receiving no answer to their knock on the rear door but hearing voices and seeing lights inside, they walked around to the front door. On the way, Trooper Haas, looking in the kitchen window, noticed the plaintiff and his wife sitting at a table with a bottle of liquor between them. When one of the officers knocked at the front door, Mrs. Anderson opened it and asked them in for a drink.

When they entered the house, Anderson was sitting at the table with a bottle of liquor in front of him. They told him about the complaint and asked him if he had again fired the gun. He replied that "he could do any goddamn thing he wanted to do on his own property." They observed that Anderson was intoxicated, his eyes were bloodshot, he reeked of alcohol, and he could not walk normally. One of the officers checked the garage to locate the gun but was unsuccessful. Anderson failed to disclose the whereabouts of the gun. Trooper Haas was concerned about what might happen in the neighborhood if they left without taking action. He testified that "[t]he only thing I was thinking of was the neighbors, a man in an intoxicated condition as far as I am concerned shouldn't be shooting." He told Anderson that he was under arrest and that they were going to lodge him in the County Jail.[2] When Anderson refused to go with them, the officers were forced to carry him to the car. Anderson and his wife admitted that he had discharged the gun five times over the period.

The jury from these facts could reasonably conclude that Anderson was intoxicated and was discharging a shotgun with live shells in a crowded neighborhood in reckless disregard of the lives and property and peace of the inhabitants and other persons in that place. They could further conclude that his conduct had occurred over the entire evening and was most likely to continue, for it was of a continuing nature and not an isolated occurrence.

2. Charged the following afternoon under N.J.S.A. 2A:170-30 (loitering or creating a disturbance while under the influence of intoxicating liquor), he was convicted and sentenced, but appealed successfully on the ground that his conviction had been based on a clearly inapplicable statute. No deprivation of rights stemming from the use of an inapplicable statute is claimed.

New Jersey, of course, makes manslaughter a crime. N.J.S.A. 2A:113–5. It has been held in New Jersey that carelessness in the handling or use of firearms in a place where an accidental discharge will do injury is criminal negligence, subjecting the offender to indictment for manslaughter though he contemplated no harm. Charge to Grand Jury, 9 N.J.L.J. 167, 168 (1886). State v. Diamond, 16 N.J.Super. 26, 83 A.2d 799 (1951); State v. Gooze, 14 N.J. Super. 277, 81 A.2d 811 (1951); State v. Young, N.J.Sup., 56 A. 471 (1903). Here each of the elements which make up manslaughter was present except for the actual killing.[3] The mere fact that a neighbor was not seriously injured or killed can have no bearing on the constitutional validity of the arrest here, since the officer surely does not have to wait until the completion of the crime before making the arrest. As the Supreme Court said in Draper v. United States, 358 U.S. 307, at 313, 79 S.Ct. 329, at 333, 3 L.Ed.2d 327 (1959):

> " 'In dealing with probable cause, * * * as the very name implies, we deal with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.' Brinegar v. United States, supra, 338 U.S. at 175 [69 S.Ct. at page 1310, 93 L.Ed. 1879]. Probable cause exists where 'the facts and circumstances within [the arresting officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or *is being committed*. Carroll v. United States, 267 U.S. 132, 162 [45 S.Ct. 280, 69 L.Ed. 543]." (Emphasis ours.) See also Beck v. State of Ohio, 85 S.Ct. 223 (1964).

New Jersey still recognizes common law crimes. N.J.S.A. 2A:85–1. At common law, breach of the peace was a crime, and Anderson's conduct at least constituted such a breach. 11 C.J.S. Breach of the Peace § 1 et seq. And the officers certainly had probable cause to believe that that crime had been and was being committed.

Lastly, there is a statute in New Jersey, as follows:

> "2. Any person who in any place, public or private,
>
> \* \* \* \* \* \*
>
> "b. Obstructs, molests or interferes with any person lawfully therein;
>
> \* \* \* \* \* \*
>
> "Is a disorderly person." N.J.S.A. 2A:170–29.

It seems clear to us that the officers as prudent men could reasonably believe that Anderson had committed or was committing this offense. The statute obviously prohibits any conduct which obstructs, molests or interferes with another person within the limits of the actor's ability to do so. The word "therein" must, of course, refer to the word "place" and not to either the word "public" or "private." Those words are used to make it clear that it makes no difference whether the prohibited action is in a place which is public or private. Thus, the word "therein" does not require the person protected by the statute to be confined with the actor in any narrow, private property boundary line.

Of course, the contention of the officers that they acted in good faith and without malice can be no defense in the civil action here brought under § 1983, for, as stated in Beck v. State of Ohio, supra:

> " \* \* \* We may assume that the officers acted in good faith in arresting the petitioner. But 'good

---

**3.** It could very well be argued that the required intent to constitute Anderson's later firing of the gun an attempted voluntary manslaughter could be found from the fact that they occurred after the officers had told him of the complaint by the neighbors and the possible consequences of his actions. N.J.S.A. 2A:85–5.

faith on the part of the arresting officers is not enough.' Henry v. United States, 361 U.S. 98, 102 [80 S.Ct. 168, 4 L.Ed.2d 134]. If subjective good faith alone were the test, the protections of the Fourth Amendment would evaporate, and the people would be 'secure in their persons, houses, papers, and effects,' only in the discretion of the police." 85 S.Ct. 229.

And in this circuit we have over the years held that

"* * * The Civil Rights Act is not to be interpreted narrowly. Valle v. Stengel, 176 F.2d 697, 702 (3 Cir. 1949). In Hague v. C.I.O., 101 F.2d 774, 789 (3 Cir.), modified, 307 U.S. 496, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), we said 'such an action sounds in tort.' In Picking v. Pennsylvania R. Co., supra, 151 F.2d at 249 we stated, '[W]e are compelled to the conclusion that Congress gave a right of action sounding in tort to every individual whose federal rights were trespassed upon by any officer acting under pretense of state law.' In Monroe v. Pape, supra, 365 U.S. at 187, 81 S.Ct. at 484, it was said that 'Section 1979 [42 U.S.C.A. § 1983] should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions.' While a specific intent to deprive a person of his constitutional rights is required under criminal sections of the Civil Rights Acts, 18 U.S.C. §§ 241, 242, neither specific intent nor purpose to deprive an individual of his civil rights is a prerequisite to civil liability under the civil provisions of the Civil Rights Act. See Stringer v. Dilger, 313 F.2d 536 (10 Cir. 1963). If Basista was forcibly taken from his home without just cause or provocation and subjected to physical abuse and unlawfully detained by Scalese, absence of motive, purpose, or intent on the part of Scalese to deprive Basista of his federally protected rights is immaterial." Basista v. Weir, 340 F.2d 74 (C.A.3, 1965).

In their brief the defendants request this court to enter judgment in their favor. At the trial, oral motions to dismiss were made by counsel for the defense both at the close of the presentation of the plaintiff's case and at the close of all the evidence. A reading of the trial transcript indicates that the second of these motions was intended to be one for a directed verdict, and was considered as such by the trial court. Assuming, *arguendo*, that we can regard it in that light, we are restrained from considering the entry of judgment for the defendants because counsel failed to renew the motion for a directed verdict by a motion for judgment *non obstante veredicto* as required under Rule 50. F. R.Civ.P. Rule 50. Moore & Vestal, Manual of Federal Practice and Procedure 1640–41 (1964).

The judgment of the district court will be reversed and the cause remanded for a new trial in accordance with this opinion. This action, of course, disposes of the cross appeal at No. 14592.